## LOUISA H. TURNER

*v.*

## LOUIS KUEHNLE.

[Submitted July 15th, 1906. Decided August 10th, 1906.]

1. Complainant having refused to sign a deed with her husband for the purpose of conveying certain of his real estate which he had acquired during the marriage, the husband, acting in collusion with the vendee and the mortgagee, employed an attorney to foreclose the mortgage which the husband had assumed on purchasing the property. The attorney purchased on foreclosure, in his own name, for the amount of the mortgage and interest, he having misled complainant to believe that her interest in the property would not be affected, after which he transferred his bid to the husband's vendee, who completed his contract with the husband for the purchase of the property.—*Held*, that the land was chargeable in behalf of the wife with an annuity equal to the interest on one-third of the proceeds of the sale after the payment of the mortgage

2. A purchaser of land under proceedings for the foreclosure of a mortgage is not entitled to the rights of a *bona fide* purchaser for value, when he is claiming the fruits of the fraud of his agent in the foreclosure proceedings, though the fraud was practiced by the agent without the purchaser's knowledge or authority.

3. Complainant discovered that certain of her husband's property was advertised for sale under foreclosure, and asked both him and his counsel whether the property was to be sold. The husband denied that there was to be any sale, and his counsel informed her that no property of hers would be sold. The sale was made to bar her dower rights, and was completed February 17th, 1890. Complainant first became aware of the real transaction after her husband's death in March, 1904, when she placed the papers in the hands of counsel for action. They were, however, returned without any action being taken thereon, when she immediately employed another solicitor, who filed a bill to enforce her dower rights in the property on March 10th, 1905. This bill was dismissed on demurrer, and on May 17th, following, the present bill was filed.—*Held*, that complainant was not barred from relief by laches.

4. Where a husband conveyed his land in his lifetime without the joinder of the wife, her dower should be measured as of the date of the husband's contract to convey, less the amount of a purchase-money mortgage thereon, not including any increase on the balance by reason of interest.

On final hearing on bill, answer and proofs.

For the opinion of this court on demurrer to the bill herein, see *63 Atl. Rep. 327.*

*Mr. Ulysses G. Styron,* for the complainant.

*Mr. John C. Reed* and *Mr. Clarence L. Cole,* for the defendant.

PITNEY, V. C.

As the facts developed on the final hearing herein vary somewhat from those set out in the bill and dealt with on the demurrer, it seems advisable to restate them.

On the 31st day of August, 1893, and before that day, the complainant, Mrs. Turner, was living in a dwelling-house in the city of Atlantic City which constituted the home of herself, her husband and their children. In point of fact, however, the husband and wife at that time or shortly afterwards were not on good terms with each other and did not cohabit as man and wife, the husband having apparently a home elsewhere, but coming to the house occasionally.

The husband was a man possessed of considerable property in and about Atlantic City, both real and personal, and entirely able to pay his debts, and so continued to a period subsequent to the transactions involved in this cause.

On the 31st day of August, 1893, he acquired title in fee-simple from one Samuel T. Hoffman to a tract of land in Atlantic City (in two parcels, comprising one lot fifty feet front and two hundred and sixty feet deep) by a conveyance of that date which expresses on its face the consideration of $16,000 with general covenants of warranty, excepting a mortgage for $4,000 of the same date, given by the grantor, Hoffman, to Messrs. William and George Allen to secure $4,000, "which said mortgage is hereby assumed by said Turner as a part of the consideration herein mentioned."

Turner took possession under that conveyance, and on the 12th of February, 1895, he executed to one John Wheeler a lease of the premises for ten years, from March 25th, 1895, at a rent of

$1,200 per year, containing a clause by which Wheeler, the lessee, had the right, at any time within one year from March 25th, 1895, to purchase the premises, free and clear of encumbrances, for the sum of $18,000, of which $6,000 was to be paid in cash and the balance by a first mortgage, payable at the expiration of ten years from its date.

Wheeler took possession under that lease, and on the 29th day of March, 1895, assigned the same to the "Otto Huber brewery," in consideration of $8,000. He also, on the 13th of June, executed a chattel mortgage to that brewing company covering a variety of chattels, being bar-room furniture and scenery.

This corroborates what the evidence tends to show, that either Wheeler or the brewing company expended moneys in converting the property into a music hall and drinking saloon. It was afterwards known as the Music Hall, and it abundantly appears that neither of them were able to pay for the improvements, so that some ten or twelve judgments on lien claims were recovered against the property, and it was advertised thereunder by the sheriff and sold to the defendant, Kuehnle, for $3,000.

In addition to that, Kuehnle swears that he had already advanced to Wheeler $4,000 in cash.

The sheriff's deed was dated the 26th of January, 1896, and on the 17th of February, 1896, the brewing company assigned to Kuehnle their chattel mortgage and the leasehold interest under Turner's lease to Wheeler.

The year in which Wheeler, by the terms of that lease, had the right to purchase at $18,000 expired on the 25th of March, 1896.

On the 25th of February, one month before the expiration of the time, and after Mr. Kuehnle had perfected his rights as assignee of Wheeler, he demanded the title from Turner.

This Turner was quite willing but unable to give without the consent of his wife, the complainant.

A deed was thereupon prepared in the ordinary form from Turner and his wife to Kuehnle for the premises.

Previous to that, Turner, when making conveyances of real estate from his wife and himself, had been obliged to pay his wife something substantial for her inchoate right of dower, and in the negotiations leading up to a bargain a young lawyer, Mr.

John S. Westcott, practicing in Atlantic City, had acted as go-between, and resort was had to him in this instance by Mr. Joseph Thompson, of the Atlantic bar, commonly called Judge Thompson, who was employed by Mr. Kuehnle to secure the title of the premises from Turner.

Judge Thompson had also been counsel for Turner in many matters before that time, but it is proper to say that there is nothing to show that he had any standing retainer from either Mr. Turner or Mr. Kuehnle, but was at perfect liberty to appear in any litigation for or against either of them.

He was, however, distinctly employed by Kuehnle in the then present matter.

Being informed that young Mr. Westcott had procured from Mrs. Turner her execution to other conveyances of real estate made by her husband, he, Thompson, at Turner's suggestion, handed to him the proposed conveyance, unexecuted by her husband, as I recollect, and requested him to procure her execution of it.

Mr. Westcott had an interview with Mrs. Turner and asked her to join in the deed, which she declined to do unless she was paid. This he reported to Judge Thompson, who, according to his, Westcott's, evidence, replied that they, or Mr. Turner, would not give more than $200 or $300 to Mrs. Turner to join in the deed, because there was a mortgage outstanding against the property which could be foreclosed, and her inchoate right of dower be cut off for that amount of money. This sum Mrs. Turner refused to accept.

There the matter ended, for, as I recollect the evidence, it does not expressly appear that Mr. Westcott reported that statement of Judge Thompson's to Mrs. Turner, although the probability is that he did do so, as they had some two or three interviews on the subject.

Mr. Westcott was not the stated solicitor of Mrs. Turner, but had acted for her in loaning on bond and mortgage a portion of the money which she had received in a previous transaction of a sale of lands by her husband.

With regard to the statement by Mr. Westcott of what Judge Thompson said to him as to the foreclosure of the mortgage for

the purpose of cutting off Mrs. Turner's dower, it is proper to say that Judge Thompson, on the witness-stand, stated that he had no recollection of having used any such language.

On the 10th of March, 1896, a few days after the failure of negotiations to procure Mrs. Turner's signature to the conveyance, Mr. Thompson filed a bill by Kuehnle in this court against Turner to compel the specific performance of the contract of sale contained in the lease.

At the proper time he filed a *lis pendens* in the county clerk's office in aid of that bill. He issued a subpœna against Turner at the filing of the bill, returnable the 28th day of March, which was duly served upon Turner. No further proceedings were taken under that bill, and no answer was filed by Turner.

To go back to the mortgage given by Hoffman to the Allens. That was, shortly after it was made, assigned to Mr. William Fitton, of Atlantic City, and the interest seems to have been promptly paid upon it up to the 28th of February, 1896, which, it is to be observed, was at about the time that the effort was being made to procure the signature of Mrs. Turner to the conveyance. The principal of the mortgage had been due since 1894, but six months' interest, up to the 28th of February, 1896, seems to have been received by Mr. Fitton from Mr. Turner.

I will now give Mr. Thompson's language as to how the mortgage came into his hands. After stating that he had filed a bill against Turner for specific performance, and had let the matter stand, he continues:

"About seven months after I filed this bill [which would be October 10th], Mr. William Fitton, whom I had been attorney for from the time he came to Atlantic City, I presume, up and till the time of his death, brought the bond and mortgage which has been referred to in this matter that was foreclosed, and told me that he wanted it collected. He said that he wanted his money; that Mr. Turner could not pay him, and he wanted me to collect it, and he said *that Mr. Turner said he would pay the expenses of the collection.*

"Q. (By the court.) That he, Turner, would pay them?

"A. That he, Turner, would."

He then proceeded to state that he foreclosed the mortgage, making Mr. and Mrs. Turner and Kuehnle defendants, and that

at the day of sale he attended with Mr. Fitton. He ascertained the amount required to pay the principal and interest of the mortgage and the sheriff's execution fees, and bid that amount (which turned out to be a few dollars less than the amount due), and that the property was struck off to him.

The sheriff does, indeed, say that he thinks there were other bidders, but Judge Thompson does not mention any others, and the fact that he swears that he made a single bid, which turned out to be a few dollars short of the amount necessary to pay the whole amount due and the sheriff's execution fees, is a strong indication that there was but one bid.

This sale was confirmed, although the property was well worth $25,000 to $30,000.

I will continue Judge Thompson's account of what occurred afterwards:

"A few days after the sheriff's sale, Mr. Fitton and Mr. Turner came to my office and they told me that they wanted to carry out—that Mr. Turner wanted to carry out the contract which Mr. Kuehnle had purchased through a sale made under the mechanics' lien, if Mr. Kuehnle would perform the contract. I saw Mr. Kuehnle and told him that the way was open for him to acquire the title to the property if he still wanted to. He said that he would carry it out under the original terms, that Mr. Turner would have to pay any expense that he had incurred or had been incurred by me in the matter of the filing of the bill against him. It resulted in the end in the bid being assigned to Mr. Kuehnle, Mr. Kuehnle taking title from the sheriff, and then the moneys passed through my hands, representing Mr. Kuehnle in the matter, and a settlement was finally made with Mr. Turner."

That settlement with Mr. Turner is manifested by certain documents in the handwriting of Mr. Cole, then in the employ of Mr. Thompson, rendered to Mr. Turner, and found by Mrs. Turner's son in her husband's trunk after his death, which occurred March 17th, 1904.

The sheriff's sale took place on the 6th of February, 1897. The deed was dated March 1st, 1897, and a statement made up by Mr. Cole, under the direction of Judge Thompson, is dated March 1st, 1897, and it credits Turner with $18,000, the consideration money mentioned in the contract; interest on $12,000 for eleven months, $660, making a total of $18,660. It credits

Kuehnle with the mortgage to Turner for $10,000, being $2,000 less than the sum that was provided for in the original contract. It credits him with the further sum, cash and note, $2,500, making $12,500, which, deducted from $18,660, left due Turner $6,160. From this is deducted as follows:

| | | |
|---|---:|---:|
| Paid Fitton mortgage and interest.......................... | $4,240 | 94 |
| Sheriff's costs............................................ | 81 | 54 |
| Court costs............................................... | 70 | 84 |
| *Costs of bill in equity*................................... | 50 | 00 |
| Recording mortgage....................................... | | 85 |
| *Services in foreclosure and equity case*................... | 100 | 00 |
| Making a total of.................................... | $4,544 | 17 |

This amount of $4,544.17, deducted from $6,160, left a balance due Turner of $1,615.83, which was paid to Turner by Judge Thompson's check. This statement was forwarded to Mr. Turner by Judge Thompson, together with the receipted bill for the sheriff's execution fees and check, with an explanatory letter from Judge Thompson, enclosing also the bond for $10,000, and a few days later another letter, with the mortgage securing the same.

Let us now go back to the commencement of the foreclosure proceedings. The subpœna, with tickets, which issued on the filing of the bill to foreclose, was duly served on Mrs. Turner at her house, and the sheriff's return shows that the copy for Mr. Turner was also left at the house for him. Those papers Mrs. Turner immediately forwarded, without examination, to her husband, who then had an office or some sort of a residence in Philadelphia.

This was done in pursuance of a standing request made by Mr. Turner to his wife.

Mrs. Turner heard nothing more of the affair until a few days before the sale, when she saw an advertisement of the sale of the premises in a newspaper, and at once obtained an interview with Judge Thompson, which she relates this wise:

" 'Mr. Thompson, I understand, or I seen in the paper where the music hall property is to be sold,' and I said, 'You know Mr. Turner is doing

bad, has left home and is doing bad,' and I said, 'Don't let him sell it, Mr. Thompson,' and he said, 'Why, Mrs. Turner, don't worry anything about it; your property will not be sold by the sheriff.' "

She states that she went to Mr. Thompson because she knew that he was Mr. Turner's lawyer. Then she further says that her husband came to her house the night before the sale and stayed all night, and that the next morning she asked him if the Music Hall property was going to be sold, and he said, "No," and she said, "I see it advertised in the paper where it was to be sold Saturday," and he said, "That don't mean that it has to be sold." Later and in the afternoon of that day she saw him again, and she asked him if the property had been sold, and he said, "No, it had not, and it was not going to be," and she said, "You say, then, it isn't going to be sold?" and he said, "No, not a damned bit of it." In the meantime, however, she had sent her son to the place of sale, and he told her that it had been sold, but did not mention the price. About two months afterwards she called at Judge Thompson's office and saw Mr. Cole and asked him about the matter, and he told her the property had been sold, and she told him she had not signed any paper in connection with it, and he went to the safe and got the sheriff's deed and looked at it and told her that her name was in the deed, and she asked him to look after her interests in the property, and he replied that he could not do it.

Let us now see what the effect of these proceedings were in equity upon the complainant's inchoate right of dower.

We have Judge Thompson employed by Kuehnle in February, 1896, to perfect his title in the premises by enforcing against Turner the Wheeler contract, of which he was assignee, and we have a deed of conveyance prepared by Judge Thompson to be executed by Turner and his wife, and the bond and mortgage prepared to be given to Turner for a part of the consideration money, in strict accordance with the terms of the contract, and we have Judge Thompson, at Turner's request, asking Mr. Westcott to try and procure Mrs. Turner's signature to the deed, and we have her refusal and the report thereof to Judge Thompson, and we have Judge Thompson's refusal, on behalf of Turner, to

pay more than $200 or $300, the amount of the costs of the fore-closure of the Fitton mortgage. It is true that Judge Thompson denies any recollection of having made the statement which Westcott swears he did. But a careful consideration of the manner of Mr. Westcott on the stand and of all the circum-stances leads me to the conclusion that his evidence on that subject is reliable. He was quite clear in his recollection, and I cannot bring myself to the conclusion that his evidence was manufactured. It is much easier to believe that Mr. Thompson has forgotten that he used the language in question.

And here it is proper to mention a circumstance not previ-ously referred to, viz., that the original conveyance from Hoff-man to the two Allens and the assignment of the mortgage to Fitton were all carried through under Judge Thompson's super-vision, and he personally negotiated the assignment of the mort-gage to Fitton.

I therefore conclude that the foreclosure of this mortgage, in order to bar Mrs. Turner's inchoate right of dower, was in the mind of Judge Thompson at the outset.

Then we have the filing of the bill for specific performance and the issuing of process thereon, with the filing of the *lis pendens,* the failure of Turner to file any answer thereto, and the failure of Judge Thompson to enter a decree *pro confesso* for want of an answer, or to take any proceedings thereon. He said he advised his client to let the matter lie for the present. For this deliberate delay he gives no reason whatever. It is to be remembered that his client, Mr. Kuehnle, had a considerable amount at stake. He had advanced $4,000 in cash to Wheeler, the original contractee; had bought in the premises at sheriff's sale for $3,000, and had been in possession, as he swears, at that time for about six months. But I find no difficulty in account-ing for that delay in pressing the specific performance suit when I find by the master's report in the foreclosure case that the interest on the mortgage in question had been paid by somebody, presumably Mr. Turner, up to the 28th of February, 1896, the bond being dated August 31st. It would be suspicious at least to commence suit in foreclosure immediately after having re-

ceived the semi-annual payment of interest. So a delay occurred until the 13th of October, when the bill was filed.

Then we have the remarkable statement made to Judge Thompson by Mr. Fitton when he handed him the bond and mortgage for foreclosure, which has already been quoted, namely, *that Turner told Fitton that he would pay the expenses of a foreclosure.*

Mr. Thompson then knew that the foreclosure was the result of an arrangement between Turner and Fitton. Turner was notoriously, at that time, able to pay the interest on the mortgage, so that Thompson must have known that the foreclosure was at Turner's request, and it is impossible to avoid the conclusion that he understood that the object of it was to cut off complainant's inchoate right of dower and perfect the title which Turner was willing to make to Kuehnle, and he, Thompson, acted on that arrangement up to the very last, when he charged Turner $100 counsel fee, over and above the taxed costs in the foreclosure case, and over and above a fee of $50 in the specific performance case.

Now, when the property came to a sale, Judge Thompson accompanied Fitton to the sale and bid the property in in his own name for the amount of the decree and costs.

The question arises at once, Did he buy that for himself, or as trustee and agent of some other person or persons, and if as agent and trustee, then for whom, and where were the interests of his client, Mr. Kuehnle, who had a large sum at stake?

That gentleman swears that he paid no attention whatever to the matter from the time he put it into Mr. Thompson's hands, but trusted to and relied upon that gentleman to look after his interests. Then we have it quite clear that Judge Thompson acted as trustee, first, for Mr. Fitton, to the extent of the amount due on his mortgage, and second, for his client, Mr. Kuehnle. He could not stand by and see property worth $25,000 sold for a little over $4,000 without protecting that client's acknowledged interest.

Was he trustee for anybody else? If not, then his plain duty was to transfer the bid to Mr. Kuehnle upon that gentleman paying the amount of his bid to the sheriff. But this he did not

do, but recognized the rights of Mr. Turner, thereby, as I conceive, acknowledging in the plainest manner that he was also acting as trustee for that gentleman, and before assigning the bid he saw to it that Mr. Turner received the amount of purchase-money to which he was entitled under the Wheeler contract.

In other words, he acknowledged by his conduct that he bid off the property for the benefit of the three persons, the mortgagee, the vendor and the vendee, as their rights severally appeared under the contract of sale and the mortgage.

It is quite impossible to suppose for a moment that Mr. Turner stood by and saw this valuable property, his equity in which was worth at least $14,000, struck off to Judge Thompson for the comparatively trifling sum due on the mortgage, unless he had a previous arrangement with the bidder to protect his interests. In fact, the case in this respect is entirely transparent.

And it seems to me idle to argue that in all that transaction, from the unsuccessful effort to procure the signature of Mrs. Turner down to the close of the transaction, as manifested by the statement and letters of March 1st, 1897, that Mr. Thompson was not acting voluntarily and intelligently as the agent of the three persons named severally, and as the solicitor in this court of Fitton and Kuehnle, and with a full knowledge, at every step taken, of their object to produce the result finally arrived at.

Now, I think that conclusion brings the case within the equitable rule upon which I relied in dealing with the demurrer to the bill.

I think that the case is not varied by the circumstance that no active measures are shown to have been taken to prevent intervening bidders.

The sacrificing of property at sheriff's sale under similar circumstances is too common in this state to excite remark or raise doubts.

The real transaction was in substance and effect a sale and conveyance by Turner to Kuehnle for $18,000, of which the amount due on the mortgage was devoted to its payment and

the balance paid to Turner. This balance of over $14,000 constituted the real surplus money on the sale, and should have been paid into court, and the case must be treated accordingly.

The more serious question arises from the fact that the complainant had actual notice of the sale, and did not employ counsel to look after her interests. She did, however, go to Judge Thompson, whom she was entirely justified in believing was acting as counsel for her husband, and whom I find, as a fact, was acting as such in the very matter in hand, and she asked him about the sale and begged of him not to let it go on, and she swears that Thompson said, "Why, Mrs. Turner, don't worry anything about it; your property will not be sold by the sheriff." Now, Judge Thompson does not recollect this interview; but here again I feel constrained to believe Mrs. Turner. Moreover, I have not overlooked the peculiar verbiage which Mrs. Turner puts in Judge Thompson's mouth. She was speaking of the advertised sale of the Music Hall property, and his answer was sufficiently ingenious, "Your property will not be sold by the sheriff." She was severely cross-examined, and on the cross-examination her previous evidence on direct was treated by counsel for defendant as being an assertion that Judge Thompson told her that the Music Hall property would not be sold, and the question was so understood by Mrs. Turner in answering. But I cannot infer that he used words different from those stated by the witness, however she may have understood them.

Then we have her asking her husband about it the morning of the sale, and his assurance to her that it was not going to be sold.

Then we have her sending her son to the place of sale and his report to her that it had been sold, without stating the price.

Then we have her asking her husband whether it had been sold, and his denying it. Then we have her consciousness that she had not signed any mortgage or paper relating to that property, and this feeling of assurance she still had a right to entertain, for her husband acquired the property in 1893, and she swears that the break between the two occurred in 1894, so that she had a distinct recollection that she had signed no paper in connection with the property, and felt a confidence that no suit could affect her interest in it. The idea that a mortgage could

be put upon it before her husband took the title did not occur to her.

However, later on, and after the sheriff's deed was made and delivered, she did call at Mr. Thompson's office and saw Mr. Cole and asked him about it, and was informed by him that, although she had not signed any paper, her name was in the sheriff's deed. She also called on Mr. Kuehnle, according to his story, after he had paid for the property, and made some sort of an assertion of right in the premises, which Mr. Kuehnle refused to recognize. This is testified to by him, but the complainant's attention was not called to it on the stand.

The precise and only present right of Mrs. Turner which she neglected to enforce was to except to the sheriff's sale on·the ground of the insufficiency of the purchase price, and to resort to the proof of the Wheeler contract on record and the subsequent rights of Kuehnle thereunder and expenditures made on the property in support of her exception, and it is to be presumed that if she had taken that course she would have succeeded in having a large surplus sum paid into court to be dealt with precisely as Chancellor Zabriskie dealt with the surplus in *Vreeland* v. *Jacobus, 19 N. J. Eq. (4 C. E. Gr.) 231.*

If she had understood her rights and comprehended the facts and situation in time to have intervened to prevent the confirmation of the sale, much might be said in favor of the position that she had deliberately abandoned her rights. The record of the foreclosure shows that the sale took place on February 6th; that it was reported by the sheriff on the 8th, and his report filed February 10th, and the sale confirmed on the 17th of February, so that she had very little time in which to think over and learn her rights.

But here comes in the consideration mentioned in my opinion on the demurrer. It was a part of the plan of the gentlemen who devised and carried through the scheme in question that Mrs. Turner should not be advised of her rights, and they did all in their power to keep her in ignorance and to assure her that her rights were not in danger, and they cannot now complain that their plan succeeded, and that her anxiety was not

sufficiently aroused in time to enable her to thwart and break up their scheme.

One other point put forward by the defendant is that if Mrs. Turner had intervened sooner, Kuehnle might have saved himself out of the $10,000 mortgage which he subsequently paid. I think the observation which I have just made applies to that point. But Mr. Kuehnle had direct notice, shortly after he got the sheriff's deed and paid his money, and long before the mortgage became due, that the complainant was dissatisfied, and hoped for at least some compensation, which he declined to make.

In fact, he is chargeable in equity with knowledge not only of the facts, all of which were known to his counsel, Mr. Thompson, but also with the knowledge of the law of the land as applied to those facts, and should have fortified himself by a proper guarantee against complainant's claim at the time he took the title.

And this brings me to what I conceive to be the principal point made by the defendant in his able and ingenious argument. He contends that the defendant is not chargeable with notice of the constructive fraud practiced by Judge Thompson upon the complainant, and he refers to the rule laid down by Mr. Pomeroy (*Pom. Eq. Jur.* § *688*) and to the case of *Saffron* v. *Raynor, L. R. 14 Ch. Div. 406 (1880)*. But that case and the section of Pomeroy relied upon apply to an entirely different set of facts. The true rule, as applicable here, is laid down in sections 666 and 667. In section 667 the learned author says:

"The general rule also applies where the same agent or attorney in reality acts on behalf of both parties to the transaction, for both the grantor and the grantee, the vendor and the vendee, the mortgagor and the mortgagee,"

citing a long list of authorities, among others *Losey* v. *Simpson, 11 N. J. Eq. (3 Stock.) 246* (at *p. 251*), where the rule is stated by Chancellor Williamson.

But another rule intervenes here which is applicable to all such cases. A purchaser situate as is the defendant here cannot take advantage of the doctrine of "innocent purchaser without notice," when he is claiming the very fruit of the fraud which

his agent has practiced without his knowledge or authority. I acted on that principle in *Johnston* v. *Reilly, 68 N. J. Eq. (2 Robb.) 130* (at *p. 150*)., citing *2 Pom. Eq. Jur.* § *909.* The same doctrine is laid down in *Perry Trusts* § *172.* The rule is a familiar one, and requires no citation of authority to sustain it.

We have seen that the complainant first became aware of the real transaction between her husband and the defendant when she came into possession of the papers relating thereto, found in her husband's trunk some time after his death in March, 1904. She then put the papers in the hands of competent counsel in Camden for advice and action, who kept them for a period of time and returned them to her without taking any action thereon. She then employed her present solicitor, who filed a bill for her on the 10th of March, 1905, to which a demurrer was interposed, and was held good and the bill dismissed. As no opinion was filed, I am not informed as to the grounds on which the demurrer succeeded. That decree was on the 16th of May, 1905, and the present bill was filed on the 17th of May, 1905. I state these facts to show that there has been no unreasonable delay since the complainant became aware of the facts upon which her right is based. But be that as it may, the delay has worked no injury to defendant, but the contrary.

It remains to inquire as to the extent of the complainant's relief.

She relies upon the seizin of her husband, and the extent of that seizin measures her right. That seizin was the title in fee, subject to the mortgage of $4,000. Then the value of the land must be taken as at the time of the sale by the husband, which was, in equity and for present purposes, the date of the Wheeler lease. But it is immaterial whether it is taken at that date or the date of the sheriff's sale, since the husband was not entitled to the increase in value by reason of improvements put on the property by the defendant.

I am also of the opinion that the principal sum of the mortgage, $4,000, is all that can be charged against the complainant on the one side, and that she is not entitled to any increase over and above the $18,000 by reason of interest on that sum.

The result is that she is entitled to interest on one-third of

$14,000 from the date of her demand for her dower. Whether for this purpose the filing of the first bill on March 10th, 1905, is to be deemed a demand, or whether the bill herein must be considered as the only demand, has not been discussed, and I have not carefully considered it. If counsel wish to be heard on that question I will hear them.

The logical result is that an annuity equal to the interest on $4,666.66 in favor of complainant during her lifetime should be decreed to be a charge upon the land.

Chancellor Green, in the case of *Chiswell* v. *Morris, 14 N. J. Eq. (1 McCart.) 101,* ascertained the total present value of the widow's dower upon the principle of life annuities to be calculated upon the basis of the table prescribed by the rules of the court. I am not at present aware that the widow can be compelled, against her will, to accept a sum in gross, ascertained on that basis, and the question was not discussed by counsel in their arguments. I will hear counsel on that subject if they desire, and will determine the question upon settling the form of the final decree. The complainant is entitled to a counsel fee, in addition to her costs.